

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00060-CR
No. 02-21-00061-CR
No. 02-21-00062-CR
No. 02-21-00063-CR

_____

LATTRELL PEJUAN TEAL, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1508820D, 1597638D, 1597640D, 1597647D

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

## I. Introduction

Appellant Lattrell Pejuan Teal had been participating in a Supervision-with-Immediate-Enforcement (SWIFT) Court program as part of his deferred-adjudication community supervision for drug and firearm offenses[1] when one of his former associates, seeking leniency on his own criminal charges, gave the district attorney's office some Facebook[2] photos and a Facebook Live video post showing Teal's continued engagement in drug offenses.

---

[1]Teal was indicted for possessing illegal drugs and unlawfully possessing a firearm. In cause number 1508820D, Teal was initially indicted for one count of possession of heroin (one gram or more but less than four grams) and one count of possession of marijuana in a correctional facility, both third-degree felony offenses, but the marijuana offense was dropped by the time Teal entered the deferred-adjudication plea bargain. *See* Tex. Penal Code Ann. § 38.11(d)(1), (g); Tex. Health & Safety Code Ann. §§ 481.102(2), .115(c). In cause number 1597647D, Teal was indicted for possession of a firearm by a convicted felon, also a third-degree felony. *See* Tex. Penal Code Ann. § 46.04. In cause number 1597638D, Teal was indicted for possession with intent to deliver etizolam (more than 28 grams but less than 200 grams), a second-degree felony. *See* Tex. Health & Safety Code Ann. §§ 481.104(a)(2), .114(c). And in cause number 1597640D, Teal was indicted for possession with intent to deliver methamphetamine (four grams or more but less than 200 grams), a first-degree felony, which the State reduced to the lesser-included offense of possession, a second-degree felony. *See id.* §§ 481.102(6), .112(d).

[2]Social-networking sites like Facebook "allow users to establish an online account, create a profile, and then invite others to access that profile as a 'friend.'" *Campbell v. State*, 382 S.W.3d 545, 550 (Tex. App.—Austin 2012, no pet.). A Facebook page or other social-media site can provide a wealth of information about someone, including his or her nickname, preferences ("likes"), and photographs of his or her current appearance, associates, and activities. *See Tracy v. State*, 597 S.W.3d 502, 510 (Tex. Crim. App. 2020) ("likes" and "shares"); *Beham v. State*, 559 S.W.3d 474, 477 (Tex. Crim. App. 2018) (photographs); *Ruffins v. State*, 613 S.W.3d 192, 195 (Tex. App.—

Based on these Facebook materials and his over 30 years' experience in criminal justice, among other facts, an investigator in the DA's office procured a search warrant for Teal's January 1–31, 2020 Facebook information, which included records, posts, messages, and other videos. After the SWIFT Court judge reviewed the Facebook information obtained under the warrant, she discharged Teal from the SWIFT Court program for "program violations." The State then sought to proceed to adjudication on Teal's deferred offenses based on his having been "unsuccessfully discharged"[3] from the SWIFT Court program.

At the revocation portion of the hearing, Teal's Facebook records and related testimony—but not the videos themselves—were admitted without objection. Teal then sought to suppress the Facebook videos, first—in his written motion—because the search warrant affidavit "did not properly establish probable cause[4] that an offense

---

Austin 2020, pet. granted) (nicknames); *see also Tienda v. State*, 358 S.W.3d 633, 634 n.3 (Tex. Crim. App. 2012) (explaining that social networking websites allow users to post photographs and videos).

[3]"Unsuccessful discharge" is probation lingo, meaning here that the SWIFT Court judge succeeded in discharging Teal—"in other words, that her decision to discharge [Teal] from the program was effective and within her discretion"—because sufficient evidence supported her determination that he had become unsuccessful in meeting the program's requirements. *See Jackson v. State*, No. 06-17-00158-CR, 2018 WL 1462217, at *1 & n.1 (Tex. App.—Texarkana Mar. 26, 2018, no pet.) (mem. op., not designated for publication).

[4]A search warrant's issuance depends on probable cause, *Diaz v. State*, 632 S.W.3d 889, 892 (Tex. Crim. App. 2021), which requires a sufficient nexus between criminal activity, the items to be seized, and the place to be searched, *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013). We do not focus on what other facts could or should

had taken place"; then, during the hearing's second day, because the warrant was insufficiently particularized; and finally, during the hearing's third day, because there was insufficient probable cause to search "his entire Facebook account in the month of January." The trial court denied Teal's motion, and after the trial court adjudicated Teal guilty, the State sought to admit the Facebook videos during the punishment phase. The trial court admitted the videos into evidence, sentenced Teal to 20 years' confinement for each offense, and set the sentences to run concurrently.[5]

---

have been included in the warrant affidavit but on the combined logical force of the facts that are in the affidavit. *Diaz*, 632 S.W.3d at 892. Although a magistrate may not baselessly presume unsupported facts, the magistrate may make reasonable inferences from the facts contained within the affidavit's four corners. *Foreman v. State*, 613 S.W.3d 160, 164 (Tex. Crim. App. 2020), *cert. denied*, 141 S. Ct. 2632 (2021). Ultimately, the test—a flexible and nondemanding standard—is whether the affidavit, read in a commonsense and realistic manner and afforded all reasonable inferences from the facts contained within, provided the magistrate with a "substantial basis" to issue the warrant. *Id.* Even in close cases, we defer to a magistrate's probable-cause determination, in part because we seek to encourage police officers to use the warrant process. *Id.* And the fact that the affidavit in this case sought social-media records adds another twist militating against Teal's position. *See, e.g.*, George M. Dery III, *The Indiscretion of Friends: Fourth Amendment Concerns About the Ability to Predict A Person's Online Social Activity by Monitoring Her Contacts*, 21 Minn. J.L. Sci. & Tech. 137, 145 (2020) ("People seeking Fourth Amendment protection from predictive surveillance online must first overcome a profound stumbling block—the fact that they have undermined their own privacy by involving themselves in social media in the first place.").

[5]Each indictment in Teal's cases contained a repeat-offender allegation alleging that he had previously been convicted of attempted murder, but the State waived the allegation in two of the cases. In the heroin and firearm cases, in which the allegation remained, the trial court found the allegation true, enhancing the punishment range from third-degree to second-degree felony (that is, from 2-to-10 years' confinement to 2-to-20 years' confinement). *See* Tex. Penal Code Ann. §§ 12.33(a), .34(a), .42(a).

In three points, Teal complains that the trial court abused its discretion by not suppressing the videos and by proceeding to adjudicate him guilty without examining the SWIFT Court judge's use of discretion, which was in turn based on the Facebook videos. Because Teal failed to preserve his suppression complaints for our review and because the trial court did not abuse its discretion by revoking his community supervision and adjudicating his guilt, we affirm.

## II. Revocation

We review a trial court's decision to proceed to an adjudication of guilt and to revoke deferred-adjudication community supervision under the same standard as a revocation of regular community supervision. *See* Tex. Code Crim. Proc. Ann. art. 42A.108(b); *Hongpathoum v. State*, 578 S.W.3d 213, 215–16 (Tex. App.—Fort Worth 2019, no pet.). The State must prove by a preponderance of the evidence that the defendant violated at least one term or condition of his community supervision, and we review a resulting revocation order for an abuse of discretion. *Hacker v. State*, 389 S.W.3d 860, 864–65 (Tex. Crim. App. 2013); *Bryant v. State*, 391 S.W.3d 86, 93 (Tex. Crim. App. 2012). The trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony, *Hacker*, 389 S.W.3d at 865, and we review the evidence in the light most favorable to the trial court's ruling, *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984).

5

## A. Three-day hearing

We will examine the testimony and suppression arguments presented during the revocation hearing, which took place on three nonconsecutive days over the course of several weeks, because error preservation is a systemic requirement that we must independently review before addressing a claim's merits. *Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016).

### 1. Day 1

Investigator Steve Groppi testified about his over three decades' worth of law-enforcement experience. Before joining the DA's office three years earlier, he had been a Fort Worth police officer for 30 years, 19 of them in the gang unit. He had also worked with federal task forces on narcotics-related assignments and had become familiar with—and had investigated cases against—Teal. He testified that Teal's Facebook username was Lathrell.Teal.7.

Investigator Groppi stated that between August 2019, when Teal was placed on community supervision, and March 2020, when the State petitioned to proceed to adjudication, he had seen one of Teal's Facebook Live videos, which Investigator Groppi explained was a video recorded "at that moment," like a "live TV shot" with which viewers could interact directly by texting comments for Teal's real-time response. Investigator Groppi stated that he had identified Teal by his face and voice and that Teal displayed narcotics in the video. This prompted him to seek a search warrant for Teal's Facebook records for the month of January 2020. When the trial court asked if

defense counsel had any objection to State's Exhibit 2 (a thumb drive of Facebook records obtained with the warrant) and to State's Exhibit 3 (a business-records affidavit certifying the records), defense counsel stated, "No, sir." The trial court admitted State's Exhibits 2 and 3 into evidence.[6]

Investigator Groppi then testified about the contents of State's Exhibit 2, which consisted of Teal's Facebook messages and photos but no videos. During the January 1–31, 2020 timeframe, people had messaged Teal, asking for "zip," "rain," "XO's," "Skittles," and other drugs. Investigator Groppi explained that "zip" was slang for marijuana and that "XO's" and "Skittles" were slang for ecstasy.[7] He then testified about some of the individual messages requesting quantities (e.g., "four grams"), prices, and the pick-up location, which he described as the same location at which Fort Worth police had arrested Teal for the drug offenses underlying the deferred cases.

Investigator Groppi testified about Teal's Facebook videos, which showed Teal rolling and smoking marijuana cigarettes, displaying pills and multiple phones,[8] and

---

[6]On the second day of the hearing, defense counsel informed the court that he had not seen the "almost 1400 pages" in State's Exhibit 2. However, he also acknowledged that the State had furnished the information to him.

[7]Ecstasy is the street name for methylenedioxymethamphetamine (MDMA), which is a Penalty Group 2 controlled substance. *Alford v. State*, 358 S.W.3d 647, 651 (Tex. Crim. App. 2012); *see* Tex. Health & Safety Code Ann. § 481.103(a)(1).

[8]According to Investigator Groppi, drug dealers typically have more than one phone.

driving to the probation office. When the prosecutor offered one of Teal's videos into evidence, however, defense counsel stated that he had not seen the videos; the trial court gave him until the hearing's next day to review them.

Investigator Groppi continued—without objection—to testify about what he had seen on the Facebook videos. He stated that he had seen Teal hand-roll a cigarette with marijuana in it and then pan to his vehicle's center console and display a "clear plastic bag with green leafy substance, which through [his] training in 33 years of law enforcement" has almost always been marijuana. Investigator Groppi described pills, visible on Teal's table, as having been light blue in a quantity of "more than ten" and appearing to be Oxycodone or Vicodin, neither of which was legal without a prescription. Investigator Groppi observed that "[t]hey were just laid there like he was waiting to hand them out or something." According to Investigator Groppi, in some of the videos, Teal told viewers to come and buy drugs, saying things like, "I've got freakathy," a form of ecstasy tablet, and giving a price. He also saw Teal smoke marijuana in the videos on several occasions. After receiving the Facebook videos, Investigator Groppi turned them over to the prosecutor, who gave them to the probation department. The remainder of Investigator Groppi's testimony was postponed until defense counsel could review the videos.

The rest of the hearing's first day was dedicated to testimony by Virginia Bourland, who worked for the Tarrant County Community Supervision and

Corrections Department as the SWIFT Court's senior officer.[9] Bourland testified about the SWIFT Court's purpose and methods and about Teal's background and participation in the SWIFT Court program.

Bourland explained that the program was for probationers who were either initially assessed as high risk to reoffend or who the court thought were "headed towards revocation."[10] When SWIFT probationers violate a condition of their probation, they receive a minimum of two days of jail time; the jail time is increased if they repeat the violation. Bourland explained that if, for example, the SWIFT probationer violated the no-drug-use probation condition, "we would increase the jail time usually by two days at a time," and then after the third drug-use violation, the SWIFT probationer would be placed "in custody for a drug-and-alcohol assessment and evaluated for treatment." SWIFT Court probationers were drug-tested more frequently than regular probationers. Bourland said that typically, when probationers first enter the SWIFT Court program, "they take about six drug tests a month for the first two months," and if all of the drug test results are negative, the probationers are dropped down to four drug tests a month for the next two months, then two drug tests

[9]Bourland had been a probation supervisor for over twelve years and had been a SWIFT Court officer for almost nine years.

[10]The record contains the SWIFT Court Warning signed by Teal, which notes that he was either new to probation and was assessed as posing a high risk to reoffend or that he had been noncompliant on probation and was heading toward revocation. It cautioned that participating in the SWIFT Court program was "not probation as usual."

a month for two months, and then one drug test a month for the last month. During that time, SWIFT Court probationers would also undergo a hair-strand drug test, which measures three months of drug use and is harder to manipulate than a urinalysis test, which captures short-term drug use. The hair-strand test would have to be negative to remove a probationer from the urinalysis "hotline." Bourland noted, however, that during the COVID-19 pandemic, SWIFT Court probationers were not as frequently tested.

SWIFT Court, a grant-funded program, required that a defendant be categorized as "high risk" and monitored at a certain level to qualify. According to Bourland, Teal—who had spent 15 years in prison for attempted capital murder and aggravated robbery—qualified for the high-risk program "based on his criminal history [and] his documentation as a gang member." Teal had simultaneously been on probation in Dallas County for another firearm offense while on probation in Tarrant County.

Bourland testified that Teal, the father of 14 children, raised and sold pit bulls and, while on probation, also worked at a mental-health group home. He had been in the SWIFT Court program from October 2019 to March 2020 and had violated his probation a couple of times—first when he failed to report for his initial office visit with his SWIFT officer and then when he traveled outside Tarrant County—but he was not discharged from the SWIFT Court program for those violations, although he would typically have received two days of jail time or work release. Bourland stated that most defendants are not kicked out of the SWIFT Court program for their first violation and

that the SWIFT Court usually allowed them to exhaust "all jail time that [they] legally can" because the goal is "to have them be successful on probation."[11] She stated that "unless they get a new offense or quit showing up to probation, typically we continue to work with them as long as they're willing to."

Bourland testified that Teal had passed all his urine-based drug tests but should have been referred for a hair-strand test. He had perfect attendance in the SWIFT Court's cognitive behavioral outpatient day-treatment program, which he completed. Bourland said that Teal had been "very attentive and cooperative" in the behavioral program and had done "a good job" in it. Teal was nonetheless "unsuccessfully discharged" from the SWIFT Court program after the DA's office had asked her to review some Facebook videos and photos received via the search warrant. Bourland had reviewed the Facebook materials with the SWIFT Court judge, and she agreed that the materials were so egregious that Teal was not given any more chances because the SWIFT Court judge "did not feel it was right to keep a defendant in the program who was obviously breaking his conditions of probation."

---

[11]Bourland stated that Teal had also had some GPS violations on his electronic monitor "where we lost track of him for a couple of hours in January of 2020," but because he had tried to report a problem with the electronic monitor, he was not given jail time.

**2. Day 2**

Two weeks later, the adjudication hearing resumed on the same day that Teal filed his motion to suppress.[12] In his motion, Teal argued that the search warrant "did not properly establish probable cause that an offense had taken place," and he sought to suppress "certain incriminatory evidence which now serves as primary evidence against [Teal] in this motion to adjudicate."

The State objected that Teal's motion was untimely because the Facebook records had already been admitted into evidence.[13] State's Exhibit 28, the warrant and affidavit, were admitted for suppression-hearing-record purposes. The warrant, dated February 26, 2020, ordered Facebook's records custodian[14] to furnish to Investigator Groppi seven categories of records pertaining to Lathrell.Teal.7 for the month of January 2020. Although the affidavit was directed to Facebook's records custodian, it also referred incorrectly to Google. The information sought was alleged to have been used in violation of "Possession of a Control Substance Penalty Group 1," and it set

---

[12]Before the hearing's second day, Teal also filed a motion for appointment of a digital expert to investigate the evidence, and the trial court granted the motion. The record contains no evidence from any such investigation.

[13]The State also argued that the affidavit was supported by sufficient probable cause.

[14]The warrant cited "PC 187," but California's search-warrant statute pertaining to electronic communications is California Penal Code Section 1524.3. Facebook is headquartered in California. *See* Our Offices, *at* https://about.facebook.com/company-info/ (lasted visited June 10, 2022).

forth Code of Criminal Procedure Article 18.02, Subsections (10) and (13) as grounds

for issuance. *See generally* Tex. Code Crim. Proc. Ann. art. 18.02(10), (13).[15]

In the affidavit, Investigator Groppi referenced his "extensive training in both

Criminal and Narcotics Investigations" and stated that he knew from his 31[16] years'

---

[15]Article 18.02(a)(10) provides that a search warrant may be issued to search for and seize "property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense." Tex. Code Crim. Proc. Ann. art. 18.02(a)(10). A search warrant may not be issued under Article 18.02(a)(10) unless the supporting affidavit also sets forth sufficient facts to establish probable cause that a specific offense has been committed, that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense, and that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched. *Id.* art. 18.01(c).

Article 18.02(a)(13) provides that a search warrant may be issued to search for and seize "electronic customer data held in electronic storage, including the contents of and records and other information related to a wire communication or electronic communication held in electronic storage." *Id.* art. 18.02(a)(13); *see also id.* arts. 18.02(b), 18A.001(10) (defining "electronic communication"), 18B.001(7)–(8) (defining "electronic customer data" and "electronic storage"). An Article 18.02(a)(13) warrant must meet the requirements of Article 18B.354, which requires the supporting affidavit to provide sufficient and substantial facts to establish probable cause that a specific offense has been committed and that the electronic customer data sought constitutes evidence of that offense or evidence that a particular person committed that offense and that the evidence is held in electronic storage by the service provider on which the warrant is served. *See id.* art. 18B.354(b).

[16] On February 26, 2020, Investigator Groppi signed the affidavit in which he averred that he had "approximately 31 years" of conducting narcotics investigations. The trial court heard the revocation case over a year later, during which time Investigator Groppi testified that he had been a certified peace officer for 33 years, of which 30 years had been as a Fort Worth police officer and almost 3 years had been as an investigator in the DA's office.

experience and training that Teal was using Facebook to distribute marijuana and Xanax. He stated that Teal had received 96 months of deferred adjudication on August 26, 2019; identified three of Teal's four deferred-adjudication cases as drug-related; and stated that Teal's community-supervision conditions included that he would commit no offenses "against the laws of this State or of any other State or the United States." He also stated that in January 2020, he met with Racine Guillory, one of Teal's associates; that Guillory had received a Facebook Live post and several photos from an anonymous source; and that Guillory showed him the photographs from https://www.facebook.com/lathrell.teal.7, which Guillory told him was Teal's Facebook page. The photographs "were of what appears to be Xanax pills for sale from [Teal]," and the Facebook Live post was of Teal "offering to sell what appears to be marijuana." Investigator Groppi averred that the posts "were only open to those who are Friends on [Teal's] Facebook page and are not open to public viewing."

Investigator Groppi further attested in his affidavit that after meeting with Guillory, he received a phone call from Guillory's anonymous source, who informed him that the Facebook posts Guillory had shown him were dated January 9, 2020. Investigator Groppi averred that Facebook posts like the ones he was shown were "common ways of notifying customers that the Defendant has a supply of drugs for sale[]" and that he had reviewed Teal's Facebook page, https://www.facebook.com/lathrell.teal.7, which he stated he knew was one of Teal's many Facebook pages. Investigator Groppi stated that he believed the Facebook data

14

"may contain evidence related to illegal activity that is in direct violation of the Defendant's Deferred Adjudication Agreement," and he sought "permission from the court to conduct review of . . . LATTRELL TEAL'S Facebook Page described above."

The trial court allowed defense counsel to voir dire Investigator Groppi on the affidavit.[17] Teal's counsel established that Investigator Groppi had made a typo regarding the California penal-code section and had erred by referring to Google. Investigator Groppi acknowledged that Guillory was one of Teal's co-defendants and had a drug-related criminal history. He agreed that some of Guillory's felony charges had been dismissed on January 17, 2020, and conceded that he had never before used Guillory as a confidential informant. Instead, Inspector Groppi said that he had verified what Guillory told him "through the anonymous phone call." Investigator Groppi stated, "[I]t's usually the anonymous source we get first and then we confirm it another way. This time it was the person confirming it first and the anonymous source kind of adding to it." Investigator Groppi also agreed that Guillory had shown him a Facebook Live post and several photos from the anonymous source.

When asked what probable cause he had to request the Facebook information, Investigator Groppi replied, "Based on the information of Mr. Guillory and the information I received from the anonymous source [, who] stated that's the account it

---

[17]Information outside the four corners of the affidavit, such as testimony from the suppression hearing, should be considered only to determine if there was a material misrepresentation within the affidavit. *Diaz,* 632 S.W.3d at 893.

15

came from. I also knew that it was his account from prior reviews of it." When further asked about probable cause, Investigator Groppi again referenced his experience in narcotics-trafficking investigations. He stated that narcotics traffickers have multiple social-media accounts and that he knew that Teal had multiple accounts. Investigator Groppi agreed that he did not independently know that Teal specifically was using Facebook Messenger to conduct drug transactions but that he knew from experience that drug dealers commonly used the service.

With regard to Investigator Groppi's attested-to narcotics experience, Teal's counsel asked, "You're saying in that paragraph that you know from your experience that this man is doing these things on Facebook when all you have is that one video and three photos, correct?" Investigator Groppi replied, "Correct. Based on my experience, though, and then my knowledge of his activities, that's very common within people who are on Facebook."

The prosecutor then asked Investigator Groppi, "[H]ow did you come to find out that [Teal] was selling drugs on Facebook?" Investigator Groppi replied that another prosecutor had approached him and told him that Guillory had information about Teal's selling drugs on Facebook and had photos and a video.[18] Investigator Groppi met with Guillory and viewed the photos and the Facebook Live video. From

---

[18]The State filed a notice of potential *Brady* material on the same day of the hearing regarding the Facebook materials that Guillory's defense counsel had brought to the State's attention.

the video, he identified Teal and what appeared to be illegal narcotics—pills and marijuana. He started working on a search warrant and then received a phone call from the anonymous source several days later. Investigator Groppi said that he had previously investigated Teal for domestic violence and narcotics and that Teal was known to use and deal drugs. Guillory told him that the anonymous source was afraid of Teal and did not want to provide the information to anyone; when Investigator Groppi spoke with the anonymous source, the source corroborated what Guillory had told him and what Investigator Groppi had himself seen. Investigator Groppi acknowledged that his history with Teal was not mentioned in the affidavit.

At the conclusion of the hearing, Teal's counsel argued that the warrant had not been sufficiently "particularized," referencing *United States v. Morton*, 984 F.3d 421 (5th Cir. 2021), *vacated by*, 996 F.3d 754, 755 (5th Cir. 2021).[19] The prosecutor distinguished

---

[19]The Fifth Circuit initially held in *Morton* that the good-faith exception to the Fourth Amendment's exclusionary rule did not apply when the officers' reliance on defective warrants to search a defendant's cell phone had been objectively unreasonable. 984 F.3d at 423. The search-warrant affidavits had sought approval to search the defendant's cell phone for his contacts, call logs, text messages, and photographs, seeking evidence of his drug-possession crimes. *Id.* at 425. Although the affidavits established probable cause to search the defendant's cell-phone contacts, call logs, and text messages for evidence of drug possession—"[t]o possess drugs, one must have purchased them," and his contacts, call records, and text messages could all harbor proof of the purchase—they did not establish probable cause to support obtaining his cell-phone photographs when the affiant's testimony relied on actions of drug *dealers* and photographs rather than drug *users* and there was no evidence supporting drug trafficking. *Id.* at 427–29. The Fifth Circuit has since vacated the opinion for the cause to be reheard en banc. *See* 996 F.3d at 755. On appeal, Teal does not mention *Morton* or the cases on which the *Morton* court relied.

*Morton* as being based on cell-phone records instead of Facebook and argued that Investigator Groppi had been "specific in the warrant for what he was asking for." The trial court denied Teal's motion.

After that denial, and while the trial court reviewed excerpts of Teal's Facebook messages, Investigator Groppi again testified—without objection—about Teal's having used Facebook for drug transactions. Based on these excerpts and other messages that were read into the record, Investigator Groppi opined that Teal had been engaged in narcotics trafficking and that the messages corroborated what Guillory had told him.

The prosecutor then reoffered State's Exhibit 4, one of the Facebook videos. Defense counsel objected, stating, "I don't know what's on the disk." The trial court asked for the videos' purpose, and the prosecutor replied, "All of these are for the reasons that he was unsuccessfully discharged. So these are all of the documents that were obtained and that both [the community supervision officer] and Judge Westfall reviewed that was the cause of the defendant being unsuccessfully discharged from SWIFT." The trial court responded, "[Y]ou've proven up that he's been unsuccessfully discharged," and asked the prosecutor if she felt "a burning need to show why he was discharged." The prosecutor replied, "Not at this time," but she also stated that she intended to play the videos if Teal was adjudicated guilty and proceeded to punishment. The trial court asked Teal's counsel, "So . . . if we get to a punishment hearing, would you have an objection to me looking at those before we had the hearing?" Teal's counsel replied, "No, sir."

18

After Teal's counsel asked about the lack of photographic evidence connecting Teal to the Facebook account, the prosecutor asked to go into the videos based on the defense's having "opened the door as to identity of who [was] sending these messages that were previously published." The trial court stated that it would need time to watch the videos and postponed the hearing.

### 3. Day 3

Another two weeks passed before the hearing resumed. At the beginning of day three of the hearing, the trial court allowed Teal's counsel to clarify his motion to suppress. This time, counsel argued that the time period of the search had been overbroad, complaining that

> [w]ith the information they had, they may have had probable cause to do a specific search for the video and picture that they had seen, but *the reason we filed that motion was because we didn't believe they had the probable cause for the scope of the search, for his entire Facebook account in the month of January.* [Emphasis added.]

The trial court denied the motion again. The State then rested.

The defense called two witnesses: a friend of Teal's, who claimed that he (the friend) had posted the Facebook messages and videos, although he agreed that the videos showed Teal; and Teal's girlfriend of five years, with whom Teal worked at the group home. Both claimed that Teal had not used marijuana during probation, and Teal's girlfriend claimed that Teal did not like the paper used in commercial cigarettes and so he removed the tobacco from them and re-rolled them. Teal's friend additionally claimed that "a couple of people" had access to Teal's Facebook account and that

during Teal's probation, he had not seen Teal use or sell drugs. Teal's girlfriend said that "[t]he biggest change [when Teal was on probation] is he got a job. After all the years of his life he hadn't ever worked before and he actually accomplished that."

The trial court found by a preponderance of the evidence that the allegation in the State's petition to proceed to adjudication in all four cases was true and found Teal guilty of the offenses in those cases. The trial court then proceeded to hear punishment evidence. The prosecutor offered State's Exhibit 4, one of the January 2020 Facebook videos, and after a brief discussion off the record, Teal's counsel replied, "No further objections, Judge."[20] The trial court admitted State's Exhibit 4 into evidence.[21] State's

---

[20]Although stating "no objection" when evidence complained about in a pretrial motion to suppress is offered usually signals to the trial court an unambiguous intent to abandon a claim of error that was previously preserved for appeal, this rule is context-dependent. *Thomas v. State*, 408 S.W.3d 877, 884–85 (Tex. Crim. App. 2013). We infer from defense counsel's including "further" that he was referencing—and not abandoning—his suppression-hearing arguments.

[21]This 16-minute video of Teal driving to the probation office shows him smoking a hand-rolled cigarette; he speaks directly to his phone in between glances at the road. He also removes from his pocket a wad of cash that appears to be around three inches thick and uses it as a pretend microphone while dancing in his seat before placing it on his shoulder and then on the dashboard.

Exhibits 5–10[22] and 20–22,[23] additional Facebook videos, were also admitted with "[n]o further objections," as were State's Exhibits 13–19, which were judgments and sentences relating to Teal's prior convictions.

---

[22]State's Exhibit 5 is a 35-minute video of Teal at home. It shows him chair-dancing, singing along to music, and smoking a hand-rolled cigarette. One of the lyrics he repetitively sings early in the video is "I got the product," to which he adds, "Come get'em!" He also mentions "XOs" and when he adjusts the phone's camera, some three dozen small blue pills become visible on the black table in front of him. He also breaks apart a cigarette and sprinkles the contents onto a fresh rolling paper before reaching off-screen to add a sprinkle of something else.

State's Exhibit 6 is a 20-second video clip showing a bag of at least nineteen blue pills with the notation "Prec is on deck 30$."

State's Exhibit 7 is a 27-minute video of Teal and a dog in a vehicle. Teal smokes, sings, and dances as he drives without a seat belt, mostly watching his phone instead of the road. When he pans the video over to the dog, a plastic baggie becomes visible in the center console. When he pans over again a few minutes later, the baggie's contents—a leafy green substance—become visible.

State's Exhibit 8 is a 20-second video clip showing eight large plastic baggies containing a green leafy substance with the notation "75$ a zip" on the same black table where the blue pills could be seen in State's Exhibit 5. As the camera pans, another, larger plastic bag containing smaller bags filled with colorful pills becomes visible. In a voiceover, Teal states, "75 a zip man, come get you one."

State's Exhibit 9, another 20-second clip, shows a pan full of small multi-colored pills with the notation "Freakathy pills." In a voiceover, Teal says, "If you want to get freaky."

State's Exhibit 10, a 20-second video clip, shows more multi-colored pills with the notation "Two grams for 5[;] Pills for 1$." In a voiceover, Teal says, "Come shop, man" as the camera pans to multiple plastic baggies containing more of the multi-colored pills and then to a large plastic bag containing a leafy green substance. Teal says in a voiceover, "Come get you some weed, man."

## B. Preservation of Error

Teal complains that he sought to suppress the Facebook videos and the photos taken as screenshots from those videos because the affidavit supporting the search warrant under which the items were obtained lacked probable cause on its face. The State responds that Teal failed to preserve this complaint because his motion to suppress was untimely.[24]

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016). Concerning the admission of evidence, a party

---

[23]State's Exhibit 20 is a 43-minute video of Teal in his car, smoking a hand-rolled cigarette, conducting one-sided, profanity-laced dialogues with his Facebook Live followers—fortunately, not while driving—and singing along to music; the last few minutes show Teal in his workplace, interacting with some coworkers. State's Exhibit 21 is eight minutes of Teal in his car, driving shirtless, smoking a hand-rolled cigarette, singing along with music, and conducting another one-sided, profanity-laced conversation with his Facebook Live viewers. At one point, he states, "If you don't want no smoke, leave me alone, bro." The last minute of the video is Teal in his house with the black table from State's Exhibits 5 and 8 behind him. State's Exhibit 22 is a 14-minute video of Teal talking emotionally to his Facebook Live audience about his gang-related credentials.

[24]The State also argues that probable cause supported the warrant because Investigator Groppi confirmed any potentially unreliable source by actually viewing the Facebook photos and video Guillory showed to him; that even if the warrant was overbroad, sufficient probable cause existed to obtain the videos Teal claims should have been suppressed; and that any error in admitting the videos was harmless because they were cumulative of other evidence.

22

must object as soon as the basis for the objection becomes apparent. Tex. R. Evid. 103(a)(1); *London v. State*, 490 S.W.3d 503, 507 (Tex. Crim. App. 2016); *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011); *Reyes v. State*, 361 S.W.3d 222, 228–29 (Tex. App.—Fort Worth 2012, pet. ref'd); *see Lackey v. State*, 364 S.W.3d 837, 843–44 (Tex. Crim. App. 2012) (discussing policies underlying the timeliness requirement); *Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002) ("We have consistently held that the failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence. This is true even though the error may concern a constitutional right of the defendant." (citations omitted)). Although a defendant may appeal the denial of a suppression motion determined during revocation or adjudication proceedings, such a complaint is not preserved if the trial court does not rule on the motion until after disputed evidence is admitted without objection. *See Hongpathoum*, 578 S.W.3d at 215–16.

Further, a party generally must object each time the objectionable evidence is offered. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Clay v. State*, 361 S.W.3d 762, 766 (Tex. App.—Fort Worth 2012, no pet.). The improper admission of evidence does not constitute reversible error if the same facts are shown by other, unchallenged evidence. *Redmond v. State*, 629 S.W.3d 534, 547 (Tex. App.—Fort Worth 2021, pet. ref'd) (citing *Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998)); *see Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010) (noting that erroneously admitting evidence will not result

23

in reversal when other such evidence was received without objection, either before or after the complained-of ruling).

Furthermore, an objection preserves only the specific ground cited. Tex. R. App. P. 33.1(a)(1)(A); Tex. R. Evid. 103(a)(1)(B); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh'g); *see also Fierro v. State*, 706 S.W.2d 310, 317–18 (Tex. Crim. App. 1986) (holding that a general objection is insufficient to apprise the trial court of the complaint urged and thus preserves nothing for review). We determine whether the specific grounds for the objection were apparent from the objection's context by looking at each situation individually. *Heidelberg v. State*, 144 S.W.3d 535, 538 (Tex. Crim. App. 2004).

Additionally, the complaint made on appeal must comport with the complaint made in the trial court or the error is forfeited. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial."). To determine whether the complaint on appeal conforms to that made at trial, we consider the context in which the complaint was made and the parties' shared understanding at that time. *Clark*, 365 S.W.3d at 339; *Resendez v. State*, 306 S.W.3d 308, 313 (Tex. Crim. App. 2009); *Pena*, 285 S.W.3d at 464.

Here, by the time Teal filed a motion to suppress the Facebook materials and secured a ruling on the motion, the trial court had already admitted substantially the same evidence without objection. This included everything obtained from Facebook—minus the videos—and Investigator Groppi's testimony about the Facebook records' contents, as well as his testimony that he had turned the Facebook information over to the prosecutor, who had given it to the probation department, where the SWIFT Court judge reviewed it before discharging Teal from the program.

Additionally, Teal's arguments on appeal differ from those he raised in the trial court, where he argued that Investigator Groppi had no probable cause that an offense had been committed to support the warrant to search Facebook's electronic storage, that the affidavit and search warrant were insufficiently particularized, and that there was no probable cause to search Teal's entire Facebook account for the month of January. On appeal, Teal instead complains about specific errors—typos, misnomers, informant reliability, conclusory statements, and Investigator Groppi's lack of qualification as an expert—some of which he mentioned during his voir dire of Investigator Groppi but none of which he argued to the trial court as grounds to support the motion to suppress.[25] Based on the above, we conclude that Teal has failed

---

[25]Notwithstanding the deficiencies in Investigator Groppi's affidavit, the magistrate had a substantial basis for concluding that there was a fair probability that materials from Teal's Facebook account would show Teal's engagement in possessing drugs illegally: Investigator Groppi's narcotics-investigation experience and his having actually viewed the photographs and the video of Teal engaged in what appeared to be selling illegal drugs corroborated what Guillory and the anonymous source said. *Cf. State*

25

to preserve his appellate complaints for our review. Accordingly, we overrule Teal's first point and turn to his related complaints that the trial court abused its discretion without examining the SWIFT Court judge's use of discretion to discharge him.

## C. Third-party discretion

Teal argues in his second and third points that, based on his appellate arguments above, the Facebook videos were not admissible and should not have been relied upon by the SWIFT Court to discharge him and that the trial court failed to ensure that the SWIFT Court judge's use of discretion was on a basis that was rational and connected to community-supervision purposes. Teal refers us to *Leonard v. State*, 385 S.W.3d 570 (Tex. Crim. App. 2012) (op. on reh'g), and *Torres v. State*, 617 S.W.3d 95 (Tex. App.— Houston [1st Dist.] 2020, pet. ref'd), to support his argument that the State

> has discovered a new way to engineer a probation revocation[—]just present *ex parte* whatever information they wish to the program administrator, without notice and hearing, and convince the administrator to discharge the defendant from the program "unsuccessfully." Then follow up with a petition to proceed with adjudication and declare it a foregone conclusion.

---

*v. Duarte*, 389 S.W.3d 349, 358–60 (Tex. Crim. App. 2012) (stating that nothing corroborated the first-time informant's hearsay statement beyond confirming the defendant's address and nothing in the affidavit suggested the defendant was engaged in drug-dealing). And Teal never explained—in the trial court or on appeal—why the one-month limit was overbroad or which of the seven categories of information from Facebook were unrelated to the alleged offense. *Cf.* Bihter Ozedirne, *Fourth Amendment Particularity in the Cloud*, 33 Berkeley Tech. L.J. 1223, 1236 (2018) (noting that as to obtaining service-provider data, "[c]ourts have employed two methods: (1) requiring a temporal limitation in the warrant, and (2) requiring the service provider to filter content by turning over, for example, only e-mail to or from particular persons. Some courts have chosen to implement both methods, while others only required one.").

26

On the facts before us, this is not what the State has done, in contrast to the facts of *Leonard* and *Torres*.

In *Leonard*, the State petitioned to revoke Leonard's deferred-adjudication community supervision based on his unsuccessful discharge from sex-offender treatment. 385 S.W.3d at 572–73. The psychotherapist who discharged Leonard from the program—over the defense's objection—testified that he had discharged Leonard because Leonard had failed five polygraphs and because he believed Leonard was not being truthful based on his admissions after failing the polygraphs. *Id.* at 573. The psychotherapist further testified that he had no basis beyond the failed polygraphs to discharge Leonard from the program or to believe that Leonard was being dishonest. *Id.* He did not conduct the polygraphs himself, gave no information about the polygrapher, did not testify about what specific questions Leonard was asked or his responses, or provide any details about how the polygraphs were conducted. *Id.* at 573–74. Leonard argued that the polygraph-related testimony was per se inadmissible, but the trial court found the State's allegation true, adjudicated Leonard guilty, and sentenced him. *Id.* at 574. The intermediate appellate court reversed the trial court's judgment based on "trial by polygraph," and the Court of Criminal Appeals affirmed this decision. *Id.* at 572, 575.

In its analysis, the Court of Criminal Appeals noted that the trial court had not adjudicated Leonard's guilt based on the failed polygraph examinations but rather

because he had failed to successfully complete the sex-offender treatment program, which was a condition of his community supervision. *Id.* at 576. The court stated, "It would surely offend due process if a defendant were discharged from his therapy program for a wholly inappropriate reason—such as illegal discrimination or mere caprice—and the bare fact of that discharge were used as a basis to revoke the defendant's community supervision." *Id.* at 577. Accordingly, the court concluded that when an appellant's compliance with a community-supervision condition is subject to a third party's discretion, to determine whether the trial court abused its discretion the reviewing court must examine the third party's use of its discretion to ensure that it (1) had a rational basis and (2) was connected to community supervision's purposes. *Id.* Because the polygraph results were inadmissible, there was no basis for the psychotherapist's decision to discharge Leonard, resulting in an abuse of discretion by the trial court. *Id.* at 577, 583.

Our sister court applied *Leonard* in *Torres*. Torres had received deferred-adjudication community supervision that included shock treatment in a substance-abuse felony-punishment facility (SAFPF) where he was required to comply with all rules, regulations, and treatment programs. 617 S.W.3d at 98. The State moved to adjudicate guilt, alleging that Torres had failed to complete the SAFPF community-supervision condition. *Id.* At the hearing, the Harris County SAFPF coordinator testified that Torres was unsuccessfully discharged from the SAFPF program and that the coordinator had prepared the discharge report based on information conveyed to

him during a telephonic "treatment team meeting" with prison personnel. *Id.* at 98–99. But the coordinator admitted that he had no personal knowledge of the specific violations that had led to Torres's discharge or the particular source of any of the alleged violations—including other inmates—used to discharge Torres from the program. *Id.* at 99–100. And the discharge report itself was vague and unsupported, referencing only "numerous rules violations" and Torres's unsuccessful discharge "as a result." *Id.* Torres objected to the report as hearsay and a violation of his rights of confrontation and cross-examination, and he testified that the complaints against him had come from other inmates. *Id.* at 99, 100. The trial court granted the State's motion. *Id.* at 101.

On appeal, our sister court concluded that even if the trial court had not abused its discretion by admitting the report, the State's evidence was insufficient for the trial court to properly exercise its discretion in revoking Torres's community supervision. *Id.* at 97, 102–04. The court noted that the discharge report contained only conclusory statements without sufficient detail, elaboration, or supporting facts, and the report's author admitted that he had no personal knowledge of the incidents referenced in the report and did not know the source of the allegations. *Id.* at 104. When compared to other evidence in the record—that Torres had been successfully completing the SAFPF program; a progress report stating that since his recommendation for removal, Torres had had no disciplinary problems and had been behaving appropriately; and Torres's own testimony—the report was "evidence only of the fact that Torres was discharged unsuccessfully from the program." *Id.* Without more, then, the trial court could not

29

have determined whether the SAFPF's reasons were appropriate or based on unfounded allegations from fellow inmates. *Id.* at 104–05. Because the record reflected that the trial court had failed to consider the soundness of SAFPF's use of its discretion to ensure that it was used on a basis that was rational and connected to the community-supervision purposes, the court reversed the trial court's judgment. *Id.* at 105.

In contrast to the *Leonard* and *Torres* facts, although Teal argues that the Facebook videos were inadmissible based on an insufficient search-warrant affidavit, Teal did not object in the trial court to Investigator Groppi's testimony about their contents, and—based on our resolution above regarding probable cause and Investigator Groppi's affidavit—there is nothing inherently inadmissible about the videos, unlike the polygraphs in *Leonard* or the conclusory statements and lack of personal knowledge in *Torres*.

To support revocation of Teal's community supervision, the State had to prove by a preponderance of the evidence (1) that the SWIFT Court discharged Teal before he successfully completed the program and (2) that the basis for his discharge was "rational and connected to the purposes of community supervision." *See Hammack v. State*, 466 S.W.3d 302, 305 (Tex. App.—Texarkana 2015, no pet.) (referencing *Leonard*, 385 S.W.3d at 577).

The Facebook evidence upon which the SWIFT Court judge based her decision showed that Teal, who had been placed on deferred-adjudication community supervision for three illegal-drug offenses, was continuing to engage in illegal-drug-

related activities contrary to his community-supervision conditions. Viewed in the light most favorable to the judgments, the evidence demonstrates that the SWIFT Court judge's "program violations" bases for her decision to discharge Teal from the SWIFT Court program were both rational and related to the purposes of community supervision, one of which is to "reform the defendant." *See* Tex. Code Crim. Proc. Ann. art. 42A.301(a). That is, the evidence clearly showed that Teal had not been reformed, and the trial court did not abuse its discretion by determining—based on Investigator Groppi's testimony about the Facebook information—that the SWIFT Court Judge's unsuccessful-discharge order supported revocation. Accordingly, we overrule Teal's second and third points.

## III. Conclusion

Having overruled all of Teal's points, we affirm the trial court's judgments.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: June 16, 2022

31